## ATTORNEY GENERAL *vs.* The BANK OF MICHIGAN.

The jurisdiction of this court over corporate bodies, for the purpose of restraining their operations, or of winding up their concerns, is based upon and controlled by the statutes of the state. It has *no such jurisdiction at common law*, or under its general equity powers, and it will not interfere except when the case is fairly brought within the scope and object of the statute conferring this special jurisdiction.

The provisions of the acts of June 21, 1837, and the act of April 12, 1841, in regard to banks and incorporations commented upon and explained.

Where one part of an act is equivocal, other portions of the act may be resorted to as a guide. The occasion and the reason of the enactment, which is the same thing as the old law and the mischief; the letter of the act, whether words be used in their proper or in a technical sense; the context, the spirit of the act, whether statutes be in their nature remedial or penal, the subject matter and the provisions of the act, and the intent of the legislature in passing it, are to be considered; which intent is not to be collected from any particular expression, but from a general view of the whole of the act.

If a corporation has forfeited its rights by misfeasance or nonfeasance, such forfeiture must be shown by the pleadings; it is not to be presumed; the legal presumption is otherwise.

The fact that a bank [not protected by statute, authorizing a suspension of specie payments] has stopped payment is not of itself conclusive evidence of its inability to pay its debts, but is *prima facie* evidence of inability or insolvency.

The rule adopted in this state has been not to grant an injunction in the first instance upon the allegation alone that a bank has stopped payment, but to grant a rule to show cause and require notice to be given to the defendants. If not explained or excused in cases where the banks are not protected from a forfeiture of their charters by reason of a failure, the court would be authorized to grant an injunction and appoint a receiver. But when banks are authorized to suspend specie payments, such refusal is not even *prima facie* evidence of insolvency. *See note 3, at the end of the case.*

The true construction of the sixth section of the suspension act of April 12, 1841, is that the statements should be made out and transmitted to the Secretary of State, on the days specified, or as soon thereafter as the same can be made out and stated. *See section 6 in note 4 at the end of the case.*

Where no time is prescribed in which an act is to be done, it must be done in a reasonable time and this must be determined by the tribunal before which the question may be made.

Motion by complainant for a receiver, and on the part of the defendant for a modification of the injunction.

The bill states that December 19, 1817, the bank of Michigan was incorporated, with capital of $100,000; was organized and went into operation.

First Circuit

Attorney
General
vs.
Bank of
Michigan.

That in accordance with the provisions in its charter, the capital was afterwards augmented to the amount of $500,000.

That February 25, 1831, the charter was continued for twenty-five years from and after the first Monday in June, 1839.

That ever since they commenced doing business, and down to the present time, they have had a banking house in Detroit, and have done an extensive banking business. That down to 1837, they were unembarrassed, and were able to meet and pay all their liabilities upon demand. But ever since that period, and down to the present time, they have labored under embarrassments, and have been unable during the greatest portion of the last mentioned period, and are now unable to meet and pay their liabilities; and that their officers have for some time past refused and still continue to refuse to pay the debts of the corporation; and that they have almost ceased the transaction of any business as a bank.

That the present liabilities of the bank are large; that its bills issued and in circulation amount to upwards of {$200,000; that it is indebted largely to depositors, and otherwise; all of which are payable on demand.

That the state of Michigan is a creditor as bill holder to over $20,-000. That June 11th, 1841, complainant demanded payment or security, which was refused by the president and cashier of the bank.

Complainant charges insolvency, and avers that the interests of the state require that it shall be enjoined, and a receiver appointed.

That in consequence of their refusal to redeem their bills, numerous suits have been commenced against them, and their cash funds are becoming diminished, and some creditors receive the full face of their debts, while others may ultimately receive but partial payment. That a due regard to the interest of the *creditors generally* requires an *injunction* to prevent the inequitable distribution of its cash means.

That in and by the act entitled " an act to provide for proceedings in chancery against corporations, &c," approved June 21, 1837, the Chancellor has power to restrain by injunction any bank from exercising any of its banking powers, and from receiving or paying out any thing, whenever the Attorney General upon bill filed shall fur-

First Circuit

Attorney
General
vs.
Bank of
Michigan.

nish satisfactory proof that such bank *has become insolvent, or unable, or has refused to pay its debts.* And in and by the seventh section, the Chancellor may compel such bank to discover any stock, property, moneys, things, choses in action or effects alleged to belong to it, or in any manner liable for the final payment of its debts, the transfer and disposition thereof, and all the circumstances of such transfer and disposition; and that every such officer, agent or stockholder may be compelled at the discretion of the Chancellor to answer any bill filed to obtain such discovery.

The bill prays that defendants be required to answer all the allegations in the bill, and particularly that they answer and discover as particularly required in and by the seventh section as above quoted.

The bill prays the granting of writ of *injunction*, &c., restraining them from exercising any of their corporate rights, privileges or franchises, and from collecting or receiving any part of their debts due or to become due; and from paying out or in any way transferring any of the money, property or effects of the bank.

Also for the appointment of a *receiver* or *receivers*, in pursuance of the fifth section of the act last aforesaid, in order that the assets of the bank may be applied in an equal and proportionate manner to the payment of its debts.

The answer admits the organization of the bank, the augmentation of stock, the extension of the charter; that it was unembarrassed up to 1837, that since that time it had been embarrassed and unable to meet and pay its liabilities, and has refused so to do. That the present liabilities of the bank are large, but insists that its liabilities are now less by $1,200,000, than in 1837, and $70,000 less than they were four months ago; and that for many years past their aggregate liabilities have not been so small as now.

Admits indebtedness to the state of Michigan to amount over $20,-000. And that the bank officers did refuse to pay the same as stated by complainant, and did decline to execute securities for the future payment of the same in specie; but that although they may have declared their inability to do so, as charged in the bill, it was not because the bank was not possessed of that, and a much larger amount in specie, but because they did not deem it their duty to pay

First Circuit

Attorney
General
vs.
Bank of
Michigan.

the state of Michigan in specie, when they could not pay all bill holders in specie. But they aver that they did offer the Attorney General to turn out the assets of the bank in payment ; and that he might have selected from all the assets amounting in all to nearly a million of dollars ; and of a value very much more than sufficient to cover and pay all the debts of the bank.

Expressly denies insolvency, and avers that the contrary is the fact. That on 15th February last, upon the examination by committee of the legislature, the said committee and officers of the bank made a scrutinizing examination into the situation of the bank, and of all its assets ; by which investigation it was ascertained as certainly as such a fact could be, that the assets were sufficient to pay off and discharge all its liabilities ; and not only so, but also to leave a surplus, after being converted into cash funds, of more than $400,-000, to be divided among the stockholders. That since said 15th February last, no material change has taken place in the condition or value of said assets, or to depreciate them, unless it be that the *two thirds or appraisal law* passed last winter may operate injuriously. That some of their securities have been changed—some of the paper then held by the bank has been paid ; but that no change has taken place, so great as to render the insolvency of the bank a probable fact, although the stock-holders may be affected. That the bank has in its vaults in specie funds about $50,000.

Admits that numerous suits have been commenced and continue to be, to the injury of the bank by accumulation of costs and expenses.

Answer avers that although now embarrassed, the bank is able and willing to pay and redeem all its bills by turning out their assets.— That many of its creditors are desirous of being thus paid, and the interests of the public can not be injured by it. That the bank has made great efforts to pay off their large liabilities which it had created in 1836-7 ; and has succeeded in liquidating almost entirely those which were the largest and most pressing, and is now comparatively free from the pressure of large debts.

States that the appointment of a receiver would be ruinous to the interests of the stockholders, and could not be beneficial to the pub-

lic, the state of Michigan, or the creditors of the bank. That a sud-
den and forced winding up of its affairs by a receiver, would be pro-
ductive of mischief and injury to the bank, stockholders, and credi-
tors.

ATTORNEY GENERAL, in person.

*Insolvency* is defined to be *inability* or *refusal to redeem.* Both are
charged, and both admitted.

*Suspension of payment* is evidence of insolvency, which cannot
be rebutted by the naked assertion of its *ultimate ability to pay.*—
Such assertion is nothing more than an expression of an opinion as
to the future value of.the assets.

Whether such opinion is well or ill founded depends upon the
final result, and cannot be known until the usual process has been
gone through of converting them into money.

The statements in the bill furnish evidence of insolvency.

The mortgage to the Dwights is evidence of insolvency.

If then, there is good reason to believe the bank insolvent, *by
whom shall its affairs be wound up?*

It is not proper to leave the bank in the hands of those officers un-
der whose administration it has failed.

The appointment of receivers is necessary for this purpose.

The directors and officers of the bank are appointed by and rep.
resent the *stockholders.* Their sympathies and prejudices are with
them, and are adverse to the bill holders.

The appointment of strangers will secure a fearless investigation
of its affairs, which the public have a right to expect. It may
become their duty to institute proceedings against the directors and
officers.

*The facts cannot be known until the Receivers investigate.*

In the language of Ch. Walworth, "those creditors who have been
stripped of their property by the failure of the bank, have a right to
claim from the court the appointment of receivers upon whose im-
partial investigations they can rely, and who could have no interests
in opposition to theirs." 1 *Paige* 517 ; 3 *Wend.* 588.

Ch. Walworth says, "If the interests of *stockholders* were first

First Circuit

Attorney
General
vs.
Bank of
Michigan.

consulted, it would be proper to give to those indebted to the bank, and in poor circumstances, sufficient time to buy up the bills from *honest creditors* at a great discount, and thus restore the broken institution to a state of solvency. But in such case *the real creditors* would lose the greatest part of their debts, although the *stockholders* in the end might save something of the stock. It is therefore necessary and proper, in every case of this kind, *for the protection of the creditors*, who have the first claim to the property, *to turn its effects into cash with the least possible delay*, so that a distribution may be made *before their necessities . or fears compel them to sacrifice their demands.*

The bank now seeks to obtain *from the Chancellor* what the legislature refused to grant them, to wit, immunity against its bill holders.

JOY AND PORTER, for defendants.

As to the jurisdiction of the court, it is limited by the statutes.
1. *Edwards Rep.*, 87, and cases there cited are conclusive.

The extent of the authority conferred is settled by this court in the case of *Barnum vs. Bank of Pontiac ; ante* 116.

As to the proof of insolvency upon which charge alone the injunction rests. *See* 1 *Paige* 515 ; 3 *Wend.* 590; 1 *Edwards* 92; 2 *Edwards* 286.

A receiver then cannot be appointed. Will the court modify the injunction ? It must *dissolve* it on motion, why not then modify ? The answer is *ample and complete* as to the only charge upon which the bill rests ; the whole *equity of the bill is denied.*

The only real question is whether the court will hear *this motion at this time.* We say it will, because the whole equity of the bill is denied, and exceptions can avail the complainant nothing if they are taken ; they will only cause injury to the defendant without object.— The rule relative to exceptions does not apply in such a case. 4 *Paige* 111 ; *ante* 162.

Besides the court reserved by its own order the power to modify at any time. *Edwards on Recv'rs., Swanst.* 228 ; *Merivale* 29 ; *Eden.* 122.

As to the suspension law, I will remark that the court must pre- <span>First Circuit</span>
sume that the bank is under the law, until the Attorney General <span>Attorney
General
vs.
Bank of
Michigan.</span>
shows that it is not.

So far as the Bank of Michigan is concerned, the terms of the law
are express and include the bank by name. The court will say and
presume that the bank has accepted a law enacted for its benefit,
unless the *contrary appear*. The answer was only to *the bill filed*.
The bills, neither of them charge that the bank has not accepted or
availed itself of the suspension law, and it must of course be taken
to have done so unless the contrary be stated or in some way appear.

It does not fall upon us to show that we are under the protection
of a law passed for our express benefit, unless the opposite party
charges that we *are not under it. We are there until they show that
we are not.*

A corporation will be presumed to have accepted of the terms of
an act passed for its benefit, until the contrary appear. This is rea-
son, and the principle has been repeatedly decided in the Supreme
Court of the United States. Indeed this must be so, because other-
wise the bank could not show the fact before July. The question
of filing a statement does not come up because *it does not appear* to
the court that it was not properly filed. And had any such charge
been made, we should have shown that it was properly and duly filed
under the law.

THE CHANCELLOR.—Before proceeding to the examination of the
facts disclosed by the pleadings in this cause, it will be necessary to
examine the statutory provisions which have a bearing upon the
question presented. The jurisdiction of this court in this class of
cases is based upon and controlled by the statutes. It has no such
jurisdiction at common law. *The Attorney General* vs. *the Utica
Ins. Co.* 2 *J. C. R.* 371 ; *Same* vs. *Bank of Niagara*, 1 *Hop.* 354 ;
*Verplanck* vs. *Mercantile Ins. Co.*, 1 *Edw.* 87. In the last men-
tioned case the Chancellor says : " After such repeated decisions ex-
pressly disclaiming all jurisdiction over corporate bodies for the pur-
pose of restraining their operations or of winding up their concerns
under the general equity powers of the court, the complainants must
not expect any interference, except it be under special authority of

First Circuit

Attorney
General
vs.
Bank of
Michigan.

existing statutes, and when the case is fairly brought within their scope and object." The proceedings in this case are based upon the provisions of the act of June 21st, 1837. (1) This imposes upon the court the duty of enquiring how far the powers and duties of this court are controlled by subsequent legislation. By the first section of the act of April 12th, 1841, (2) it is enacted that every provision of law in force requiring or authorizing proceedings against the Bank of Michigan and the Farmers' and Mechanics' Bank of Michigan and their branches, with a view to forfeit their charters or wind up their concerns, or which requires them to suspend their operations, and proceedings in consequence of a refusal to pay their notes or evidences of debt in specie is hereby suspended. Section three, requires the Bank of Michigan to lessen its liabilities at the rate of $20,000 quarter yearly. Section four, prohibits any bank from dividing or paying to its stockholders or to any person for them any dividends, profit, or interest, until after it shall have resumed paying its debts and liabilities in specie, and shall have continued to do so in good faith for three months. Section five inhibits the banks and their officers from selling specie or bullion at a premium, and from purchasing its notes at a discount; and provides that "every violation of this section shall be a forfeiture of its charter." Section six is, "that every such bank or branch shall transmit a statement under oath of the president, cashier, and a majority of the directors, of its true condition, once in every three months, viz : On the first day of January, April, July and October, to the Secretary of State, who shall cause the same to be published in the state paper; and the expense of such publication shall be paid by the banks respectively." Section seven is as follows : "It shall be the duty of the Secretary of State, on the receipt of each quarterly statement provided for in the sixth section of this act, to transmit as soon as practicable, to the Governor, Lieutenant Governor, Auditor General and Treasurer of this state, each, a certified copy of such statement; and if on examination of the same, it shall appear to any one of said officers, including the Secretary of State, that any bank availing itself of the provisions of this act, is, or has been so conducting its business, as in their opinion to endanger the interests or security of the

public ; or those holding its notes or other evidences of debt, or in any way improperly to abuse the privileges by this act granted ; or if from any other cause any such officer shall have good reason to believe that any such bank has so improperly conducted, then it shall be the duty of such officer with the advice and consent of one or more of his associates above named, forthwith to cause an examination to be made of the conduct and affairs of such bank; and in case it shall thereupon appear to the satisfaction of three or more of said officers, that such bank is, or has been conducting its business improperly as aforesaid, it is hereby made their duty forthwith to report such fact to the Attorney General, who is hereby required to proceed against such bank as directed in the tenth section of this act." Section eight provides, that the Bank of Marshall, the Bank of Adrian, the Merchants' Bank of Jackson County, the Bank of Constantine, and the Erie and Kalamazoo Rail Road Bank, may avail themselves of the provisions of this act, by conforming to its requirements, upon obtaining the certificate of the Auditor General, State Treasurer, and Secretary of State, that their business has been honestly managed, and that they are in a sound condition. Section nine provides, that the Auditor General, State Treasurer, and Secretary of State, before they proceed to examine such banks as may apply to them for that purpose, shall make oath before any person authorized to administer the same, that they will not grant a certificate to any bank unless they shall be perfectly satisfied that the resources of such bank are, and will be adequate to the *ultimate* payment of its circulation, and all other liabilities permitted by this act. Section ten, authorizes the Attorney General to proceed against any bank availing itself of the provisions of this act, and which shall directly or indirectly violate the same, by injunction, *quo warranto* or otherwise, in the same manner as if this section (probably a misprint for act) had not passed. The act of April 12, 1841, in its material provisions is a literal copy from the suspension law of New York of May 16, 1837. The first section is identical except that the names of the Bank of Michigan, and the Farmers' and Mechanics' Bank, are introduced. Of the construction of the New York statute there is no doubt. In respect to a portion of the banks in that state, the law

First Circuit

Attorney
General
vs.
Bank of
Michigan.

First Circuit, requires that a bank which shall suspend specie payments shall on
pain of forfeiture of its charter, "wholly discontinue and close their

Attorney
General.      banking operations." What was intended by the provision of the
vs
Bank of
Michigan.    ninth section of the suspension law of New York, placing the banks
under the supervision of the bank commissioners, and authorizing
them to institute proceedings against any bank in dangerous or in-
solvent circumstances? It could not have intended an inability to
pay their liabilities at the time, as the very object of the law was, to
relieve the banks from the penalties they incurred by reason of such
inability. It must have contemplated *ultimate* insolvency. By our
statute the officers who are constituted special commissioners for this
purpose, may if they are satisfied any bank is so conducting its
affairs as to endanger the security of the public or those holding its
notes, institute an examination, and upon the concurrence of three
of them, proceedings may be instituted under the provisions of the
act. There can be no doubt that the construction of the first section
of the New York statute is, that every provision of law requiring
or authorizing proceedings against banks with a view to forfeit their
charters or wind up their concerns, and that every provision of law
which requires them to suspend operations and proceedings in conse-
quence of a refusal to pay their notes and evidences of debt in spe-
cie is suspended. I do not well see what other construction can be
given to this section either in the New York act or our own. The
words " or which" must refer to the *provisions* of law which were in-
tended to be suspended. Where one part of the act is equivocal,
other portions of the act may be resorted to as a guide. "The occa-
sion and the reason of the enactment (which is the same thing with
the old law and the mischief,) the letter of the act (whether words be
used in their proper or technical sense,) the context, the spirit of the
act, (whether statutes be in their nature remedial or penal,) the sub-
ject matter and the provisions of the act, have all to be considered.
Again the intent of the legislature is not to be collected from any
particular expression, but from a general view of the *whole* of the
act." *Per. Best. C. J.* 3 *Bingham* 196; *Dwarris on Statutes* 47,
48. The ninth section of the law of New York places the
suspended banks under the special supervision of the bank commis-
sioners. The sixth section of our law requires the suspended banks

to transmit a statement of their condition once in three months to the Secretary of State. Section seven contemplates that the officers therein mentioned and to whom a copy of each statement is to be transmitted, and each of them, shall exercise a supervision over those suspended banks, and if in the opinion of either of them, any bank is, or has been so conducting its business as to endanger the interests or security of the public or those holding its notes or other evidences of debt, any such officer with the advice and consent of one or more of his associates may institute an examination of its affairs.— It has been shown that in the construction of statutes which may admit of doubt, we must resort to the object and intent of the legislature; the mischief to be obviated, and the remedy contemplated. It appears from the pleadings in this cause that the legislature had instituted a careful investigation of the affairs of this bank. The condition of its assets was not then materially variant from the present. Its liabilities have since that time been diminished some $120,000, and it appears that for many years no part of their assets have been used otherwise than for the payment of its liabilities. The legislature must have been aware of the inability of the bank to pay off its liabilities immediately, though they seem to have entertained no doubt of its ultimate solvency. Can it by any possibility be inferred that the legislature contemplated or intended by this legislation that this bank should be wound up on the ground of insolvency under the state of facts here presented? The insolvency is again and again denied in every form by the president and directors, who must be deemed better able to form an opinion than strangers unacquainted with its concerns, and this too after a full, careful, and detailed investigation of all their assets and liabilities. Not only is insolvency denied, but it is alleged that there will remain a large surplus after the payment of all their debts and liabilities. Did the legislature intend to treat the several banks which should become subject to the suspension act unequally? This cannot be supposed. The ninth section provides, that the banks which are named in the eighth section shall satisfy the Auditor General, State Treasurer and Secretary of State, "that the resources of such bank as shall apply to them for that purpose, are, and will be adequate to the *ultimate* payment of its circulation and all other liabilities permitted by this act." This is in harmony

First Circuit.

Attorney
General.
vs.
Bank of
Michigan

with the supervision vested in those officers by the seventh section. Under that section, if they or any three of them should become satisfied that from the conduct of the bank or the condition of its affairs, legal proceedings were necessary to effect an equality of distribution or a proper application of its means, it would then be competent for them to direct proceedings to be instituted under the provisions of that act. For the purposes of this motion it should be remarked that this bank *must* be considered as under the provisions of the suspension act. It was placed expressly under it in terms, from and after the passage of the act. If it has forfeited its rights under it by misfeasance or nonfeasance, such forfeiture must be shown. No allusion is made in the pleadings to any act of omission or commission by which such forfeiture has been incurred. It is not to be presumed. The legal presumption is otherwise. It has been held that grants beneficial to corporations may be presumed to have been accepted, and an express acceptance is not necessary. *Charles River Bridge* vs. *Warren Bridge* 7 *Pickering* 344 ; *Dart. Col.* vs. *Woodward* 4 *Wheaton* 688; *U. S. Bank* vs. *Dandridge* 12 *Wheaton* 71. But admitting that the operation of the first section of the suspension act should be limited to the failure to pay its notes or evidences of debt in specie, which from a careful examination I think it cannot, would the result be varied? The legislature could not have intended to apply one rule to the banks specially named in the first section of the act, and which were undoubtedly the principal objects intended to be benefited by it, and another to the other banks named in the act.— We have seen that those banks were required only to satisfy the officers before named of their ability *ultimately* to pay their liabilities. We have seen this ability in the case under consideration asserted and reasserted in the broadest and most comprehensive form by those best acquainted with its condition. The answer for the purpose of the present motion must be taken as true. Under either construction of the act then, the motion must be denied. Some misapprehension seems to have been entertained upon the effect of the refusal of any bank not protected by statute to pay its debts or liabilities in specie. The rule adopted here is the same as in New York. In the case of the *Attorney General* vs. *the Bank of Columbia* 1 *Paige* 511 ; the Chancellor says, that the fact that the bank has stopped

payment is not of itself conclusive evidence of its inability to pay its debts, but is *prima facie* evidence of inability or insolvency. In the case of *Stuart* vs. *Mechanics' Bank*, 19 *Johnson's Rep.* 497; it is said "a bank may be quite solvent notwithstanding it fails to redeem its bills. This we know to have happened in several instances where the ability and solvency of the banks have been afterwards fully established." The rule adopted here has been not to grant an injunction in the first instance upon this allegation alone, but to grant a rule to show cause, and require notice to be given to the defendants. If not explained or excused in cases where the banks are not protected from a forfeiture of their charters by reason of a failure to pay specie, the court would be authorized to grant an injunction and appoint a receiver. (3) But where banks are authorized to suspend specie payments, it is not *prima facie* evidence of insolvency. It may be proper to say that the result, to which I feel myself compelled by the provisions of law bearing upon this case, to arrive, in my opinion will be better for the interest of the bill holders and creditors of the bank than would be the usually disastrous measure of appointing receivers. It must be apparent that in the present condition of the country such a measure must result in great losses, and that heavy expenses must be incurred, and if by such means the resources of the bank should be found insufficient to pay its liabilities, the loss must fall upon its creditors. The entire resources of the bank have been thus far applied to the payment and security of its debts and the officers of the bank in their answers state their intention to continue so to do. The aggregate amount of the indebtedness of the directors is small. No part of the resources of the bank have been diverted to pay dividends, and I can perceive nothing in the case as presented before me, to lead to the belief that the affairs of this institution have not been honestly and in good faith administered. But these remarks which would apply properly in a case for the exercise of discretion in the appointment of a receiver, are perhaps unnecessary in the present case; as from the view I have taken of the law bearing upon it and from which I cannot escape, there is no room for the exercise of this discretion in the case. The law being positive, the rights of the defendants are fixed, and the duty imposed upon the court imperative. A question has been inciden-

First Circuit

Attorney
General.
vs.
Bank of
Michigan.

tally raised as to the construction of the sixth section of the suspension act, (4) but as it is not necessary to the decision of the case, I have had some doubt as to the propriety or necessity of expressing an opinion upon it. The facts do not appear as to when this bank filed its statement of the condition of its affairs. The question is, are the banks compelled to transmit a statement of their condition on the first days of January, April, July and October, or are they to transmit a statement of the condition *they were in on those days* as soon as the same can *thereafter* be made out and stated? It would of course be impossible to ascertain their condition on a particular day and make and transmit a statement on the *same* day. If the statement is to be *transmitted* on those days, it *must* be of their condition on some *previous* day, and each bank must be left to select its own day. This would certainly open the door for transfers from one to the other, and might lead to inconveniences which the legislature intended to guard against by requiring a simultaneous statement of the condition of all the banks on the same day. Some of the banks contemplated by the terms of the act are situate some one hundred and fifty miles distant from the office of the Secretary of State. Are those banks required to file on that day a statement of their condition, or on some indefinite previous day of their own election, or must they "transmit" by mailing their statement on that day, or was it the intention of the legislature that they should transmit a statement of their condition on the particular days indicated by the act? The statute requires that the statement of the condition of the banks shall be made under oath of the president, cashier and a majority of the directors. Should this be impossible from the absence or sickness of the president or cashier, or a portion of the directors, must the statement be actually transmitted on this particular day under pain of a forfeiture? The language and object of the act, the security intended to be afforded to the public, the inconvenience if not impossibility of otherwise conforming to its terms, all concur in leading to the construction that the statements shall show the condition of all the banks under the suspension law at one and the same period of time ; and that their statements shall be filed as soon as they can properly be prepared and examined by the different officers required to make oath to the truth of the statements of their condition

on those days. Where no time is prescribed in which an act is to be done, it must be done in a reasonable time, and this must be determined by the tribunal before which the question may be made.— 9 *Pickering* 404; *Coke Litt.* 208. But if the construction should be otherwise, I do not perceive how a failure to conform to this section on the particular days mentioned can be held *ipso facto* to work a forfeiture. The rights and immunities conferred upon this bank by the first section of the suspension act are positive and unconditional. The fifth section provides, that a failure to conform to the provisions of *that section* shall work a forfeiture. The sixth section is directory and imposes no penalty or forfeiture. The consequence of a failure to conform to the requirements contained in that section, therefore would subject the delinquent bank to be proceeded against under the provisions of the tenth section of the act, and the failure to conform to the provisions of the act must be averred and shown.— The bill as before stated contains no such averment, and as the question is not necessarily involved in the decision of this motion, I should not have deemed it necessary to express an opinion upon it, but from the consideration that the views I have taken of the law must be conclusive upon the principal object of the bill, the complainant, if any doubt is entertained of the correctness of the conclusion arrived at, may be disposed to take an appeal to the Supreme Court; and in that case it will be desirable that this question as well as the others should be presented and settled in the appellate court.

Having now said all that can be material to a decision of the question presented, it would have been certainly gratifying if consistent with my views of duty here to pause. But with the hope that it may not be without its utility hereafter, I think it my duty to refer to the unusual and extraordinary course which has been pursued during the pendency of this controversy, having a tendency to create excitement and preoccupy public opinion. Minatory articles have from time to time appeared in the public papers. The consequences of failing to yield to this artificial excitement have been shadowed forth. Various interests and considerations very far from being properly connected with any question of legal right involved in the cause, have been enlisted. A detailed recital of the circumstances referred to, is not

*First Circuit*

Attorney
General.
*vs.*
Bank of
Michigan.

deemed necessary and would afford no pleasure. It would have been
easy to have acquired cheap temporary applause by yielding to the
current. But the court has a higher duty to perform. It is bound
to declare the law as it is, and to vouchsafe to every one his rights
under the law without regard to consequences. Whenever the rights
of litigant parties shall be surrendered to any such extraneous in-
fluences there is an end of all security and of all confidence.

This is the first time I have had occasion to recur to improprieties
of this character. It is painful to do so now, I trust it may never
again be necessary.

The result is, that the motion for the appointment of receivers
must be denied. A motion was submitted at the same time for a mo-
dification of the injunction, but as the Attorney General expresses
his election that if the motion for the appointment of receivers is
denied, that the injunction should be dissolved, and as from the views
expressed, such must be the final result ; the order will be entered ac-
cordingly, except so far as relates to the assigned assets. That pre-
sents a distinct question which has not been considered, and the in-
junction will be so far retained until the further order of the court.

*Note.* (1.) See " An act to provide for proceedings in Chancery against corporations, and for
other purposes." Approved June 21, 1837. Laws of 1837, page 306.
(2.) See act No. 58 entitled " An act suspending certain provisions of law and for other pur-
poses," approved April 12, 1841. Laws of 1841, page 141.
(3.) See *See Barnum* vs. *the Bank of Pontiac, ante* 116. January 17, 1842, the act entitled
·· An act to repeal the suspension act, passed April 12, 1841 and for other purposes, " was pas-
sed and is as follows :

*An Act to repeal the Suspension Act, passed April* 12, 1841, *and for
other purposes.*

Section 1. *Be it enacted by the Senate and House of Representa-
tives of the State of Michigan,* That the act entitled " an act suspen-
ding certain provisions of law, and for other purposes, passed April
12, 1841," be and the same is hereby repealed.

Sec. 2. All banking institutions of this state shall, immediately af-
ter the passage of this act, and at all times thereafter, pay specie for
their bills obligatory and of credit, and all bills and notes issued by
said banks, on presentation and demand of the same at their counters,
during the usual banking hours ; and every failure or refusal so to do
shall be deemed conclusive evidence of insolvency.

Sec. 3. Any of the banks of this state that shall fail to resume and
continue to make specie payments, immediately after the passage of
this act, for all their liabilities on demand, shall be deemed insolvents

and their charters and all their corporate privileges shall be forfeited ; First Circuit

Attorney
General
vs.
Bank of
Michigan.
and if any such bank shall sell, or in any manner dispose of any of
its specie or other property of any description whatever, such act shall
be deemed fraudulent and void, and the President, Cashier, or other
officer, aiding in, or assenting to such sale or other disposition of said
money or property shall be deemed guilty of felony, and shall be pun-
ished by imprisonment for not less than one nor more than five years,
at the discretion of the court.

Sec. 4. Any bank or banks resuming specie payments in pursu-
ance of the foregoing provisions shall continue to pay specie for all
their bills and liabilities for six months before any dividends of the
profits of such institutions shall be made ; nor shall the officers of
said banks, nor any of them, dispose of any of their specie for any
other property, except for legitimate banking purposes, and any per-
son or persons so offending shall be deemed guilty of a felony, and
may, upon conviction thereof before any court of competent jurisdic-
tion, be sentenced to imprisonment in the State Prison for a term not
exceeding five years, or in the county jail not more than one year, at
the discretion of the court ; and the Prosecuting Attorney of any
county where any bank may be situated whose officer shall violate
the foregoing provisions shall cause the offenders to be prosecuted for
such offence, and every and all such dividends or disposals shall be
deemed fraudulent and void.

Sec. 5. In all cases where suits have been, or may hereafter be
instituted by any bank or monied corporation for the collection of
any debt, which may be due to said bank or corporation, in whatever
name such suit was instituted, or suits may be instituted, it shall be
competent for the defendant to set off the notes of such bank or cor-
poration in discharge of the liability for which said suit was instituted.

Sec. 6. This act shall take effect and be in force from and after its
passage.

Approved January 17, 1842.

Note 4.—

Sec. 6. Every such bank or branch, shall transmit a statement, un-
der oath of its president, cashier, and a majority of the directors, of
its true condition, once to every three months, viz : On the first day
of January, April, July and October, to the Secretary of State, who
shall cause the same to be published in the state paper, and the expense
of such publication shall be paid by the banks respectively.